UNIVERSITY MEDICAL CENTER, INC., Appellant

v.

AMERICAN CIVIL LIBERTIES UNION OF KENTUCKY, INC.; the Courier–Journal, Inc.; Patrick Howington; Belo Kentucky, Inc. d/b/a/ WHAS–TV; Adam Walser; and John Keith Smith, Appellees.

NO. 2013–CA–000446–MR

Court of Appeals of Kentucky.

RENDERED: OCTOBER 3, 2014; 10:00 A.M.

Briefs for Appellant: Phillip W. Collier, Bethany A. Breetz, Louisville, Kentucky, Mark R. Overstreet, Frankfort, Kentucky

Brief for Appellee, American Civil Liberties Union of Kentucky: William E. Sharp, Louisville, Kentucky.

Brief for Appellees, The Courier-Journal, Inc., Patrick Howington, Belo Kentucky, Inc. and Adam Walser: Jon L. Fleischaker, Jeremy S. Rogers, Louisville, Kentucky.

Brief for Appellee, John Keith Smith: No brief filed.

BEFORE: CLAYTON, COMBS, AND NICKELL, JUDGES.

## OPINION

NICKELL, JUDGE:

The question before us is whether University Medical Center, Inc. ("UMC")[1]—

---

1. ULH is affiliated with the University of Louisville ("UofL"). Although known by different names, ULH has been in existence since 1817 as a "publicly

operator of University of Louisville Hospital and related facilities ("ULH") —is a public agency within the scope of Kentucky's Open Records Act ("Act").[2] Two paths have been suggested to conclude UMC *is* a public agency. We may follow the lead of the Office of the Attorney General ("OAG") and hold UMC is a public agency under KRS 61.870(1)(j) because it was "established, created, and controlled by a public agency[.]" Or, we may follow the Jefferson Circuit Court's lead and hold UMC is a public agency under KRS 61.870(1)(i) because "the majority of its governing body is appointed by a public agency[.]" In contrast, UMC maintains it is a private entity, and therefore, not subject to the Act, because it was created by two private individuals representing two private healthcare providers, and the majority of its Board of Directors is elected, not appointed by anyone. For the reasons that follow, we reject the OAG's analysis, affirm the circuit court's holding, and remand to the circuit court for determination of whether the requested records are otherwise exempt from disclosure under KRS 61.878.

## FACTS AND PROCEDURAL HISTORY

Whether UMC is a public agency for purposes of the Act arises in the context of the denial of four separate open records requests—the American Civil Liberties Union of Kentucky, Inc. ("ACLU") and Patrick Howington, a reporter for *The Courier–Journal,* both sought information about a proposed merger between ULH, Catholic Healthcare Initiatives, and Jewish/St. Mary's Hospital System to create a statewide network healthcare provider; WHAS reporter Adam Walser sought information about UMC's self-reporting of any violations under the Anti–Kickback Statute, 42 U.S.C. § 1320a–7b, or Stark Law, 42 U.S.C. § 1395nn; and Keith Smith sought information about changes in UMC's billing practices. Citing a 2006 OAG opinion—Ky. Op. Atty. Gen. 06–ORD–210—UMC denied all four requests claiming it was not a public agency, and therefore, was not subject to the Act, because it did not derive "at least twenty-five percent (25%) of [the] funds expended by it in the Commonwealth of Kentucky from state or local authority funds." KRS 61.870(1)(h). In denying the requests, UMC did not assert any exemptions barring disclosure under KRS 61.878.

Pursuant to KRS 61.880, WHAS, *The Courier–Journal* and the ACLU, all appealed to the OAG; UMC appealed the Smith[3] request. On October 6, 2011, the OAG rendered an opinion on the ACLU's appeal—Ky. Op. Atty. Gen. 11–ORD–157—holding UMC is a public agency un-

owned teaching hospital that also serves as the public safety net hospital" for the Louisville area. Report of the Attorney General (December 29, 2011) (recommending rejection of proposed merger).

[I]n 1979, [ULH] was deeded to the Commonwealth of Kentucky for the use and benefit of the University of Louisville. In the Commonwealth, by statute, property used by universities and other state agencies is titled in the name of the Commonwealth of Kentucky, and is designated for the use and benefit of the particular university or agency. This designation reflects the ongoing role of the Commonwealth in all property management aspects of universities and agencies. [ULH] is a state asset operated as a teaching hospital by [UofL] for the benefit of the citizens of the Commonwealth, and subject to laws and regulations applicable to state assets.

*Id.* In reliance on the foregoing report, Kentucky Governor Steve Beshear rejected the proposed merger that prompted two of the four open records requests from which this appeal results.

2. Kentucky Revised Statutes (KRS) 61.870 *et seq.*

3. Smith did not appear in the appeal.

der KRS 61.870(1)(j) because it was "established, created, and controlled by a public agency"—UofL—and, therefore, should not have denied the open records request absent an applicable exemption, and it had failed to prove such an exemption. The OAG mentioned the immense influence and control UofL exercised over the UMC Board of Directors, but did not say UMC was a public agency due to UofL appointing a majority of UMC's board. KRS 61.870(1)(i). The 2011 OAG opinion overruled contrary portions of 06–ORD–210, which had previously held UMC was *not* a public agency under KRS 61.870(1)(h) due to its funding structure. Deeming 11–ORD–157 to be dispositive, the OAG immediately issued opinions in the three other appeals reaching the same conclusion—UMC *is* a public agency due to its lineage. Ky. Op. Atty. Gen. 11–ORD–158; Ky. Op. Atty. Gen. 11–ORD–159; and, Ky. Op. Atty. Gen. 11–ORD–160.

Thereafter, UMC filed a consolidated appeal of all four 2011 OAG opinions in the Jefferson Circuit Court. Cross-motions for summary judgment were filed. Citing KRS 61.880(5)(a), the circuit court concluded to deny the open records requests,

UMC bore the burden of proving it was not a public agency, or alternatively, the requested documents were exempt from production under the Act.

At oral argument, the circuit court specifically inquired how Community Directors[4] serving on UMC's Board of Directors would be replaced in the event of a "catastrophic emergency." The circuit court theorized that without any Community Directors, UMC's board could not meet and conduct business because a majority of Community Directors is required for a quorum. Furthermore, the Nominating Committee—which requires two Community Directors—could not meet to propose new Community Directors. The circuit court noted in the opinion entered on November 21, 2012, "[u]nlike the University Directors, who would simply be replaced by UofL, the Bylaws leave no mechanism for replacement of Community Directors under this scenario."

In reaching its conclusion, the circuit court relied on KRS 271B.8–100(1)(c)—which, absent a contrary directive in UMC's Articles of Incorporation—would allow remaining directors, even though they did not constitute a quorum, to fill all

**4.** Between nine and twelve Community Directors, ultimately elected by a majority of UMC's entire board, serve staggered, renewable three-year terms. UofL employees, trustees and officers cannot serve as Community Directors, nor can "officers, directors or employees of an entity which competes with [UMC] within the Louisville Metropolitan Statistical Area[.]" They are community leaders interested in health care issues and must constitute a majority of the Board of Directors and all committees, except the four-member Nominating Committee which has two Community Directors and one University Director, and is chaired by UofL's President. UofL controls two voting positions on the Nominating Committee outright and has the ability to influence—if not control—the votes of the two Community Directors. When UMC's bylaws were revised in 2008, the Community Directors had already been appointed by UofL.

Serving with the Community Directors is a maximum of seven voting University Directors—individuals with unquestioned allegiance to UofL who are appointed by UofL's President. University Directors must include the Dean of UofL's Medical School; UofL's Executive Vice President of Health Affairs; at least one UofL Medical School department chair; and, at least one member of UofL's Board of Trustees.

Additionally, there is an unlimited number of non-voting Advisory Directors. Seven named health-related UofL entities nominate a slate of candidates from which Advisory Directors are "elected" or "appointed"—the bylaws use both terms—to serve a one-year term. Advisory Directors are invited to attend and participate in board meetings and committee meetings, but do not count toward a quorum and participate in executive sessions only upon request.

director vacancies by majority vote—thus allowing UofL to appoint all of the Community Directors in its discretion.[5] Additionally, the circuit court noted UofL could stymie all board action by blocking the filling of a single Community Director vacancy, thereby triggering KRS 271B.8–100(1)(c) and enabling UofL to name a Community Director of its choice.

While determining UMC was not created and established by a public agency so as to fall under KRS 61.870(1)(j)—but rather was created by two private health-care providers—the circuit court held UMC is nonetheless a public agency under KRS 61.870(1)(i), because by controlling the nomination process for and appointment of Community Directors, UofL—itself a public agency under KRS 61.870(1)(f)—controls appointment of UMC's entire Board of Directors.[6] In explaining its ruling, the circuit court wrote,

UofL's control over the selection of Community Directors amounts to *de fac-*

---

5. KRS Chapter 271 pertains to private corporations and associations, which UMC maintains cannot apply to it since it is a nonprofit corporation. Although not mentioned by the trial court, KRS 273.213(1) authorizes the same result in the context of a nonprofit corporation.

6. We quote salient portions of UMC's seventeen-page amended bylaws as approved on January 29, 2008.

ARTICLE IV
BOARD OF DIRECTORS

Section 4.01 *Powers and Number of Directors.* All corporate power shall be exercised by or under the authority of, and the business and affairs of the Corporation shall be managed under the direction of, the Board of Directors, subject to any limitations set forth in the Corporation's Articles of Incorporation. Upon the adoption of these Amended and Restated Bylaws, the Board shall consist of seventeen (17) voting directors.

Section 4.02 *Composition and Qualifications.*

(a) The Chairman of the Board (the "Chairman") shall be the person elected and serving as President of the University of Louisville (the "University") or his designee. The Chairman shall be an ex officio, voting member of the Board of Directors and shall appoint a minimum of four (4) and a maximum of seven (7) additional directors, one of whom shall be the Dean of the University's Medical School, another of whom shall be the University's Executive Vice President—Health Affairs, another of whom shall be the chair of one of the clinical departments of the University's Medical School, and another of whom shall be a member of the University of Louisville Board of Trustees (the "University Directors"). The remaining directors (the "Community Directors") shall consist of not less than nine (9) and not more than twelve (12) community leaders who have demonstrated an interest in health care issues, provided that none of such Community Directors (i) shall be officers, directors or employees of an entity which competes with the corporation within the Louisville Metropolitan Statistical Area ("MSA"), or (ii) shall be a trustee, officer or employee of the University of Louisville. The determination of whether a nominee for Community Director "competes" with the Corporation within the Louisville MSA shall be made by the Directors, whose decision shall be final and not subject to appeal. Directors need not be residents of the Commonwealth of Kentucky. The Nominating Committee shall endeavor to recommend to the Directors candidates for Community Directors who represent the broad ranges of diversity within the community. (The University Directors and the Community Directors are sometimes each referred to as a "class" of directors).

(b) The term of office of the Chairman (if he is the President of the University) shall be coextensive with his term as President of the University. If the Chairman is someone other than the President of the University, he or she shall serve at the pleasure of the President of the University. The remaining 16 members of the Board of Directors shall be divided into three groups, designated as Group I, Group II and Group

III. Each Group shall comprise a combination of Community Directors and University Directors, it being provided that Community Directors shall constitute a majority of each Group. Directors shall be identified to a Group by the Chairman. Group I directors shall be appointed for an initial term of two years and, at the expiration of the initial term, Group I directors shall be elected or appointed for successive three year terms. Group II directors shall be appointed for an initial term of three years and, at the expiration of the initial term, Group II directors shall be elected or appointed for successive three year terms. Group III directors shall be appointed for an initial term of four years and, at the expiration of the initial term, Group III directors shall be elected or appointed for successive three year terms.

...

Section 4.04 *Removal of Directors.* Any Director, other than the Chairman and an ex-officio member, may at any time be removed from office, with or without cause, by a majority vote of the University Directors and the Community Directors, voting by class, upon written notice delivered to the director and to the Corporation.... Section 4.06 *Vacancies.* In the event a vacancy occurs in the office of a director due to death, resignation, removal or otherwise, the vacancy shall be filled, in the case of a University Director, by the President of the University, in the case of a Community Director, by the Board of Directors from one or more candidates nominated by the Nominating Committee[.] ... Section 4.10 *Quorum.* A majority of the Board (excluding Advisory Directors), more than half of whom are Community Directors, shall constitute a quorum of the Board. If a quorum is present at a meeting of the Board, any action taken at such meeting shall be the act of the Board. In the absence of a quorum, the Board members present, by a majority vote, may adjourn the meeting to another date, time and place.... Section 4.18 *Chief Executive Officer of University of Louisville Hospital.* The Chief Executive Officer of University of Louisville Hospital shall be the President of the Corporation and an ex-officio, non-voting member of the Board....

*ARTICLE VI*
*COMMITTEES*

Section 6.01 *Committees Generally.*
A. The Board may create committees, each consisting of three (3) or more voting directors and such other persons as the Board may determine, to serve at the pleasure of the Board; provided that more than half of the committee membership composed of voting Board members shall be Community Directors. Except as otherwise provided in these Bylaws, appointments to such committees shall be by the Chairman....
D. A majority of the members of a committee who are Community Directors shall constitute a quorum for the transaction of business at any meeting of such committee. The act of a majority of the members of a committee as a whole shall be the act of the committee.

...

Section 6.02 *Executive Committee.* The Executive Committee shall, (sic) consist of the Chairman, one University Director and three Community Directors. The Executive Committee shall have and may exercise all of the authority of the Board, but shall not have the authority of the Board in reference to amending, altering, or repealing the By-Laws; electing, altering or removing any member of that Committee or any director or officer of the Corporation; amending or restating the Articles of Incorporation; adopting a plan of merger, or adopting a plan of consolidation, with another Corporation; authorizing the sale, lease, exchange or mortgage of substantially all of the property and assets of the Corporation; authorizing the voluntary dissolution of the Corporation, or revoking proceedings therefore; adopting a plan for the distribution of the assets of the Corporation or amending, altering, or repealing any Resolution of the Board which by its terms provides that it shall not be amended, altered or repealed by such Committee; or doing any other act forbidden by law or by the Articles of Incorporation.

Section 6.03 *Nominating Committee.* The Nominating Committee shall consist of the Chairman, who shall serve as Chairman of the Committee, one University Director and two Community Directors. The Nominating Committee shall select and recommend to the Directors candidates for election as Community Directors and for filling vacan-

*to* power of appointment over the Community Directors. When combined with UofL's unquestioned power of appointment of the University Directors, this means that the majority (and in fact entirety) of UMC's governing body is appointed by a public agency. Under KRS § 61.870(1)(i), this makes UMC a public agency subject to the Open Records Act.

The secondary question—whether the requested records are exempt from disclosure—was left unanswered until UMC's status as a public agency has been resolved. The circuit court imposed no sanctions on UMC and awarded no attorneys' fees, finding UMC relied in good faith on the OAG's prior holding that UMC was not a public agency and there was no indication of bad faith in UMC's denial of the open records requests.

The circuit court ordered UMC to provide the requested records to the court for *in camera* inspection along with a brief explanation of any applicable exemption under the Act. In February 2013, the circuit court amended the Findings of Fact, Conclusions of Law and Order entered November 21, 2012, to include the sentence, "[t]his is a final and appealable Order and there is no just cause for delay in its entry or execution." This appeal followed.

### HISTORY OF UMC

In the interest of clarity and completeness, we provide a brief historical perspective of how UMC came into being. From 1983 until 1995, ULH was managed by Humana of Virginia, Inc. ("Humana"). When Humana merged with Columbia/Hospital of America, and moved its headquarters to Nashville, Tennessee, UofL and the Commonwealth of Kentucky—in June 1995—chose to terminate Humana's lease and affiliation agreements and seek a new operator/manager for ULH.

In anticipation of UofL and the Commonwealth issuing a request for proposals ("RFP") for an entity to operate and manage ULH, the Presidents of Jewish Hospital Healthcare Services ("Jewish") and Alliant Health System, Inc. (now known as Norton Healthcare and referred to herein as "Norton") launched UMC. This new nonprofit Kentucky entity was incorporated on June 27, 1995, in hopes of being chosen to operate and manage ULH; provide medical care to people in need; "carry on educational activities;" "promote and carry on scientific research related to the care of the sick and injured;" "promote the

cies in any Directorships and for officers of the Board (other than the Chairman) and the Corporation.
*ARTICLE VII*
*OFFICERS OF THE BOARD OF DIRECTORS*
. . .
Section 7.03 *Chairman of the Board of Directors.* The Chairman shall:
A. Be, at all times, the sitting President of the University or his designee;
B. Serve as an ex-officio, voting director of the Board;
C. Preside at all meetings of the Board;
D. Provide leadership to the Board and its committees in formulating developing, and evaluating corporate policies and goals and ensure such policies and goals are consistent with the Articles of Incorporation;
E. Ensure that there is appropriate communication between the Board and corporate staff, the Board of Directors and executive staff, physicians and administrative and other personnel;
F. Call special meetings of the Board;
G. Establish the agenda for all Board meetings; and
H. Perform such other duties as are customary to a Board Chairman or assigned by the Board and not inconsistent with the Articles, these Bylaws, or the Affiliation Agreement.
. . .

general health of the community;" and, "provide, on a nonprofit basis, hospital or health care facilities and services for the care and treatment of persons who are acutely ill or who otherwise require medical care and related services." UofL was not a signatory to the original Articles of Incorporation, but it is undisputed UMC was created for the sole purpose of competing for and, if successful, entering into affiliation and lease agreements to manage ULH—a public asset—for the benefit of UofL and the Commonwealth.

On June 30, 1995, UMC submitted a proposal to manage ULH. The proposal was signed only by the Presidents of Jewish and Norton. On October 16, 1995, UofL's Board of Trustees awarded the ULH management contract to UMC. In February of 1996, UMC entered lease and affiliation agreements with UofL and the Commonwealth and commenced managing ULH. Bylaws adopted in 1996 listed Jewish, Norton and UofL as members of UMC and established a twelve-member board of directors with UofL appointing six of the directors, including the chairperson.

In 2006, the OAG was asked whether UMC had violated the Act by denying an open records request for a patient file following an auto accident. On October 20, 2006, analyzing UMC's structure under KRS 61.870(1)(h), the OAG issued an opinion finding UMC was *not* a public agency because it did not receive at least twenty-five percent of the funding it spent in Kentucky from state and local authority funds. 06–ORD–210. The opinion was not appealed. Therefore, under KRS 61.880(5)(b), it had "the force and effect of law[.]"

On May 1, 2007, Jewish and Norton withdrew from UMC—at UofL's request[7]

—and a new affiliation agreement was executed between UMC, UofL and the Commonwealth of Kentucky on July 1, 2007. Under UMC's new bylaws, UofL was the sole member and had exclusive control over UMC. A new board was seated in the fall of 2007.

UMC's bylaws were revised again in 2008, this time specifying, "[t]he Board shall have charge of the policies, property, affairs, and funds of the corporation[.]" UofL's President (or designee) chairs the Board of Directors, and ULH's Chief Executive Officer serves as President of UMC, subject to the board's authority.

While no new voting directors were appointed in 2008, the previously appointed directors were designated as either University Directors or Community Directors. A majority vote of both classes of directors is needed to amend UMC's bylaws. To have a quorum, a majority of the directors must be present, and the majority of those present must be Community Directors. Any director—except the chair—may be removed "by a majority vote of the University Directors and the Community Directors[.]"

## ANALYSIS

Kentucky's Open Records Act allows a party who disagrees with an OAG decision to file an original action in circuit court and, if dissatisfied with that result, appeal the circuit court's ruling to this Court. *Medley v. Board of Education of Shelby County*, 168 S.W.3d 398, 402 (Ky.App. 2004). We review questions of law *de novo. Eplion v. Burchett*, 354 S.W.3d 598, 601 (Ky.App.2011). We review questions of fact, and mixed questions of law and fact for clear error. *Medley.* If substantial

---

**7.** According to UMC's response to interrogatories, via letters sent in June and August 2006, UofL asked Norton and Jewish to with- draw from UMC "due to conflicts of interest inherent in UMC's competitors governing UMC."

evidence supports the circuit court's decision, we affirm its factual findings. *Id.* It is against this backdrop that we consider whether UMC is a public agency for purposes of Kentucky's Open Records Act.

■ The OAG has determined UMC is a public agency "because it is an agency which is established, created, and controlled by a public agency as defined in [KRS 61.870(1)(j)]" (citation and internal quotation marks omitted). Specifically, the OAG believes UofL established, created and controls UMC. Based on the history of UMC, we disagree.

It is undisputed that the Presidents of Jewish and Norton—two private individuals leading two private healthcare providers—created UMC. Their vision is memorialized in the Articles of Incorporation they alone executed on June 22, 1995. The term "University of Louisville" appears only once in that document—as part of the first of five stated corporate purposes—"[t]o operate and maintain the hospital affiliated with the University of Louisville School of Medicine, and to provide medical care for the people who are in need of those, or related, medical services." UofL was not a named party in the creation of UMC.

That being said, it is equally undisputed that Jewish and Norton created UMC at the behest of UofL and the Commonwealth—in response to an RFP seeking an entity to run ULH in the wake of Humana's departure. The transmittal letter for the proposal signed by Jewish and Norton states in part:

Recognizing our common missions, common values and a background of nu-

merous mutually beneficial collaborative arrangements, Jewish Hospital Health-Care Services (JHHS) and Alliant Health System (Alliant) have formed University Medical Center, Inc. (UMC), a not-for-profit joint venture, to operate the University of Louisville Hospital and related facilities (ULH).

Again, the only actors mentioned are Jewish and Alliant, Norton's predecessor. The fact that Jewish and Norton acted at UofL's urging and for its benefit, does not make UofL one of UMC's creators.

■ In interpreting a statute's meaning, we must apply the "plain meaning" of the words enacted by the Legislature. *Commonwealth v. Garnett*, 8 S.W.3d 573, 575 (Ky.App.1999) (citing *Floyd County Bd. of Educ. v. Ratliff*, 955 S.W.2d 921, 925 (Ky. 1997)). In doing so, we cannot overcome the language of KRS 61.870(1)(j) which defines a public agency as:

[a]ny board, commission, committee, subcommittee, ad hoc committee, advisory committee, council, or agency, except for a committee of a hospital medical staff, *established, created, and controlled by a public agency* as defined in paragraph (a), (b), (c), (d), (e), (f), (g), (h), (i), or (k) of this subsection[.]

[Emphasis added]. While it is obvious UofL was instrumental in UMC's creation, its role was only as an instigator and beneficiary, neither of which makes UMC a public agency. UofL did not become a member of UMC until *after* UMC had been incorporated and was managing ULH.

To be sure, there is plenty of evidence[8] UofL controls ULH, but UMC operates

---

8. The current affiliation agreement executed between UMC and UofL states in pertinent part: strategic planning groups must include UofL faculty and representatives; ULH is UofL's principal adult teaching hospital;

UofL must consent in writing to all training programs or rotations at ULH and related facilities, as well as implementation and withdrawal of all training programs; any physician applying for privileges at ULH must

and manages ULH. That is not surprising or inappropriate since ULH was deeded to UofL in 1979. As a good steward of this critical public asset—which happens to be UofL's prime medical teaching ground—it is crucial that UofL have significant input into ULH's function and operation. The OAG equates this "interconnectivity" between UMC and UofL as proof UMC is UofL's "alter ego" and the two entities function as one. Again, we disagree.

To support its premise, the Attorney General relies heavily on *University of Louisville Foundation, Inc. v. Cape Publications, Inc.*, 2003 WL 22748265 (Ky.App. 2003) (2002–CA–001590–MR), an unpublished decision declaring the UofL Foundation to be a public agency because it was created and established by UofL's Board of Trustees, acting in their official capacities while UofL was a municipal university but preparing to become a state institution. A panel of this Court concluded the definition of "public agency" contained in KRS 61.870(1)(f) was broad enough to encompass a municipal university.

We easily distinguish creation and establishment of the UofL Foundation from creation and establishment of UMC. The Foundation was created and established by members of UofL's Board of Trustees "in anticipation" of UofL becoming a state university; UMC was created, established and incorporated by two private individuals in response to an RFP. While both the Foundation and UMC were created in contemplation of and preparation for a future event involving UofL, the reason for the creation is not our focus. The key inquiry in this hurdle is the nature and character of the creators, and in UMC's case, it was two private citizens overseeing two private healthcare providers—Jewish and Norton; it was not UofL, a public agency. Thus, we must reject the Attorney General's premise—as the trial court did—that UMC is a public agency because it was established, created and controlled by a public agency.

■ We turn now to the trial court's conclusion—that UMC is a public agency under KRS 61.870(1)(i) because UofL, itself a public agency, appoints a majority of UMC's Board of Directors. Under the current bylaws, the Board has a maximum of seventeen[9] voting directors, of whom no more than seven may be University Directors appointed by UofL's President, and a maximum of twelve may be Community Directors elected by the full Board after nomination by a four-member Nominating Committee. UofL—now UMC's sole member since it asked Jewish and Norton to sever ties with UMC in 2007—has complete control over who serves as a University Director because those appointments are made by UofL's President.

agree to participate in UofL's teaching programs; the Dean of UofL's School of Medicine, or designee, serves as Chief of the ULH Medical Staff; UMC is "responsible for the operations of" ULH; any surplus revenue must be reinvested in ULH or paid to UofL; UMC must provide services to UofL without charging a management fee; UMC must pay UofL lease payments; UMC must contribute to UofL's surplus cash flow; UofL must approve plans and specifications for capital improvements to new and existing facilities; UMC must report the financial condition of ULH to UofL and the Commonwealth; UMC must regularly sponsor UofL continuing education programs featuring UofL faculty and programs; UofL must approve in writing all agreements between faculty and UMC and its affiliates; UMC must maintain insurance with a carrier acceptable to UofL; and UofL must review and approve UMC's advertising of its affiliation with UofL.

9. The circuit court opinion states the board has a maximum of fifteen directors, but this is inconsistent with the bylaws provided to us which state, "the Board shall consist of seventeen (17) voting directors."

The snag lies not with the appointment of University Directors, but with the role of the Nominating Committee and its control of who will be considered for election as a Community Director. UofL's President chairs the Nominating Committee. He chooses one University Director and two Community Directors to serve on the Nominating Committee. It is highly unlikely UofL's President would allow someone unfavorable to UofL to be nominated as a Community Director. In fact, UofL's President can ensure no unfavorable candidate is ever considered because he controls the Board's agenda and handpicks the members of the Nominating Committee. While Community Directors are not directly appointed by UofL, if a potential candidate cannot be considered and ultimately proposed to the Board by the Nominating Committee, he/she cannot be elected by the entire Board. Thus, while UofL may not control the ballot box, it clearly controls the path to the ballot. As stated by the circuit court,

> [b]ecause the committee only has four members and requires a majority approval to present a nominee to the UMC board, and because UofL absolutely controls two of the four votes, no candidate for a Community director vacancy may be presented to the UMC board without the approval of U of L.

We find this analysis to be most persuasive and discern no error. *Medley*, 168 S.W.3d 398.

■ While we are intrigued by the circuit court's exploration of how new Community Directors would be named in the event of a "catastrophic emergency," we are not convinced it is controlling. The circuit court properly noted, without any Community Directors, the UMC Board would not have the quorum necessary to conduct business. Because the Articles of Incorporation and Bylaws do not provide otherwise, a majority of all remaining directors in office—even though they constitute less than a quorum—could fill any vacancies under KRS 273.213. Because UofL would have appointed all of the University Directors, they would be the only remaining directors and they would then choose the Community Directors which, as the circuit court found, would amount to "*de facto* power of appointment over the Community Directors." However, in referring back to the specific statutory language under which the circuit court tries to fit UMC, that "the majority of its governing body is appointed by a public agency[,]" the fit is imperfect. Since the new Community Directors would be "elected" by the remaining directors, they would not be "appointed" by UofL as required by KRS 61.870(1)(i)—even though they would clearly be handpicked by UofL. Thus, we do not deem the circuit court's "catastrophic emergency" scenario to compel a decision that UMC is a public agency.

Nevertheless, we still believe the circuit court reached the correct result. We hold UMC is a public agency because a majority of its Board of Directors is appointed by UofL. We reach this conclusion because UofL controls UMC's Nominating Committee, not because it could replace all the Community Directors in the event of an emergency.

WHEREFORE, we affirm the Jefferson Circuit Court order entered on November 21, 2012, holding UMC to be a public agency subject to Kentucky's Open Records Act. However, we must remand the matter to the circuit court for determination of whether the requested records are otherwise statutorily exempt from disclosure.

ALL CONCUR.